1998 OK 36

**ETHICS COMMISSION, State of Oklahoma, Petitioner,**

v.

**Frank KEATING, Governor, State of Oklahoma, Respondent.**

**No. 90010.**

Supreme Court of Oklahoma.

May 5, 1998.

As Corrected Aug. 20, 1998.

Rebecca Adams, General Counsel Ethics Commission, and David W. Lee of Comingdeer & Lee, Oklahoma City, for Ethics Commission of the State of Oklahoma.

Robert G. McCampbell and Mary H. Tolbert of Crowe & Dunlevy, Oklahoma City, for Frank Keating, Governor of the State of Oklahoma.

SUMMERS, Vice Chief Justice.

¶ 1 Governor Frank Keating and the Oklahoma Ethics Commission have joined in asking this Court to assume original jurisdiction and decide their well publicized controversy. For the reasons to be stated we grant their joint Application to Assume. Our decision is that the transportation provided to the Governor by the Department of Public Safety did not violate the Ethics Commission's Rule, that the Rule as written is overly broad in that it purports to control the Governor's statutorily provided security, and that it may not be enforced against the Governor in the context of the facts of this case as stipulated.

¶ 2 The Ethics Commission has a Rule that prohibits the use of public property for a partisan political fundraiser. The Governor has appeared at fundraisers for candidates using transportation provided by the Department of Public Safety (Department or DPS). A statute requires the Department to provide transportation to the Governor. The Ethics Commission says that the Governor cannot use this transportation to attend partisan political events. The Governor says that the statute controls. Both sides have asked us to assume original jurisdiction, and each argues that the issues involved in this controversy require a prompt resolution by this Court.[1]

## I. ASSUMPTION OF ORIGINAL JURISDICTION

¶ 3 Before addressing the merits we must inquire whether the controversy is of such a nature that this Court should assume original jurisdiction. Three related controversies involving the Governor and Ethics Commission are pending in the District Court of Oklahoma County. We are not asked to supervise the District Court controversies, but to assume concurrent original

---

1. Included in their submissions to this Court is a purported agreement as to the penalty imposed by the Ethics Commission if the Court concludes that the Commission's Rule is validly applied. We note that our State Constitution states that:

"The Commission may settle investigations and accept payment of fines without Court order." Okla. Const. Art. 29 § 4. The agreement is not at issue before the Court, and we need not address it further in light of our ruling.

jurisdiction and grant declaratory relief on the merits of the issue before the District Court. Frequently, when this Court has assumed original jurisdiction in a *publici juris* controversy we have done so because of a public need for a speedy judicial determination. *See, e.g., Post Oak Oil Co. v. Oklahoma Tax Commission,* 1978 OK 20, ¶ 5, 575 P.2d 964, 967; *Halstead v. McHendry,* 1977 OK 131, ¶ 4, 566 P.2d 134, 136.

¶ 4 The Ethics Commission argues that time is of the essence. It contends that the three pending suits in Oklahoma County District Court (not to mention any subsequent appeals) cannot be adjudicated prior to the 1998 elections. It further argues that it is a nonpartisan constitutional agency, and that it seeks an immediate adjudication of the issue in order to avoid the appearance of playing a part in the outcome of the 1998 elections. It points out that the issue is one of first impression, that the District Court has ruled that a declaratory judgment is a form of relief not available to the parties in that forum, and that the District Court suits are progressing at different rates. The Governor makes similar arguments, and points to the financial strain on the public purse.

¶ 5 In several controversies we have concluded that a public need for speedy judicial determination was present when the assumption of original jurisdiction was essential for the orderly fiscal management and budgeting of state and local governmental entities. *Keating v. Johnson,* 1996 OK 61, ¶ 10, 918 P.2d 51, 56; *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069. But the issue before us does not involve budgeting processes or expending funds of the Commission or the Governor. Rather, the essence of the arguments is that the cost of protracted District Court litigation will drain the fiscal resources of the Commission and Governor, and thereby negatively impact the performance of their public duties. Tied to this argument is the concept that the public should not be required to pay needless litigation costs.

¶ 6 The litigation-cost argument is similar to those in *Board of County Commissioners*

*of Harmon County v. Keen,* 194 Okla. 593, 153 P.2d 483 (1944) and *Atchison T. & S.F. Ry. Co. v. Love,* 29 Okla. 738, 119 P. 207 (1911). In the former case the Court explained why it would grant prohibition in the context of assuming original jurisdiction. We said that allowing further proceedings when no cause of action existed against a board of county commissioners would result in "a burdensome and expensive trial that will consume public funds, a part of which would not be taxable costs, and those that are taxable might not be recoverable." 153 P.2d at 485. In *Atchison T. & S.F. Ry. Co.,* the railroad sought original jurisdiction relief and a writ to the Corporation Commission. We said that "the interest of the state" required an early settlement on the issue of the jurisdiction of the Commission, and we then said that several unwarranted proceedings before the Commission would be "an injustice to the people who patronize this transportation company, for upon them finally will fall the great expense growing out of that class of litigation." *Id.* 119 P. at 208.

¶ 7 This authority provides a strong argument for our assumption of original jurisdiction. However, many agencies of this State are involved in litigation, and often in opposition with other State agencies. This Court cannot serve as a court of first resort for all such disputes when a district court possesses concurrent jurisdiction. *Keating v. Johnson, supra.* Intra-governmental disputes are generally adjudicated in a district court with review in this Court by appeal. See e.g., *Breeden v. Nigh,* 1968 OK 88, 441 P.2d 981, where we affirmed the district court's writ of mandamus in a dispute between the Lieutenant Governor and the Director of the Oklahoma Industrial Development and Park Commission. One reason that makes this case an exception is that a pressing need for prompt resolution is present in order to avoid a disruption of the Ethics Commission's ability to function.

¶ 8 In *Association of Classroom Teachers of Okla. City, Inc. v. Independent School Dist. No. 89 of Okla. County,* 1975 OK 118, 540 P.2d 1171, we explained that a time-

consuming district court trial and subsequent appeal would have led to a disruption of the educational system in a teacher-contract dispute. *Id.* at ¶ 20, 540 P.2d at 1175. We noted the disruption to fiscal planning and administration of the school district. *Id.* at ¶ 8, 540 P.2d at 1174. Original jurisdiction was assumed so that the important function of education would continue without disruption.

¶ 9 The Commission states that the dispute is straining its financial and personnel resources, and that a prompt adjudication is necessary. It reports that its "small staff needs to prepare for the 1998 elections—a process which, for many filers, has already commenced." It further states that only a rapid disposition of the controversy can assure a smooth operation of its functions associated with the 1998 elections. The election process is protected by our fundamental law, and the Ethics Commission is charged by our State Constitution to investigate and prosecute violations of its rules involving election campaigns. *Simpson v. Dixon,* 1993 OK 71, ¶ 15, 853 P.2d 176, 183–184; Okla. Const. Art. 29 § 4. Although we most often decide election-jurisprudence disputes in the context of reviewing an adjudication of a district court,[2] we have assumed original jurisdiction in certain disputes without requiring those litigants to first seek relief in a district court. *See e.g., Box v. State Election Board of Oklahoma,* 1974 OK 104, 526 P.2d 936; *Golden v. Okfuskee County Election Bd.,* 1986 OK 57, 723 P.2d 982. In this *publici juris* dispute where public funds may be needlessly expended and the 1998 campaign season has commenced, the public's interest in a functioning Ethics Commission for the 1998 election season outweighs the need for the dispute to be resolved first in the District Court.[3] We accordingly assume original jurisdiction pursuant to Art. 7, § 4 of the Oklahoma Constitution.

## II.

## THE TRANSPORTATION PROVIDED TO THE GOVERNOR DID NOT VIOLATE THE ETHICS COMMISSION'S RULE

¶ 10 The Ethics Commission claims the Governor has violated their Rule 257: 10–1–3(a), which states:

A person shall not use or authorize the use of public funds, property, or time, to participate or assist in the organization of or preparation for a fundraiser for a campaign or in any solicitation of funds for or against a candidate for state office or a ballot measure.

74 O.S.Supp.1995, Ch. 62, App., Rule 257:10–1–3(a).

¶ 11 The Governor claims his use of a state vehicle to attend political fundraisers is

---

2. The reason for this is due to at least two principles. First, this Court does not create election-jurisprudence remedies that were unknown at common law. *Wagoner County Election Bd. v. Plunkett,* 1956 OK 329, 305 P.2d 525, 530–531, (Court expressly explained why it would not fill-in a legislative gap and create a remedy unknown at common law for challenging a primary election). Second, in many of the disputes a statutory procedure is provided that involves a district court adjudication, and we have explained that this procedure is mandatory and jurisdictional. *Duggan v. Bailey,* 1957 OK 214, 317 P.2d 200, 202. Of course, this Court is empowered to review, by original action, such an adjudication by a district court, as well as a decision of an election board acting in a quasi-judicial capacity. *McKye v. State Election Bd. of State of Oklahoma,* 1995 OK 15, ¶ 5, 890 P.2d 954; *Stover v. Alfalfa County Election Bd.,* 1975 OK 6, ¶ 8, 530 P.2d 1020, 1022; *Boevers v. Election Bd. of Canadian County,* 1981 OK 138, ¶ 6, 640 P.2d 1333, 1335. We have also explained that this Court is empowered to issue mandamus to an election board for the purpose of correcting an arbitrary abuse of discretion or to compel the performance of a ministerial duty. *Box v. State Election Bd. of Okla.,* 1974 OK 104, ¶¶ 16–18, 526 P.2d 936, 939; *Brown v. State Election Bd.,* 1962 OK 36, 369 P.2d 140, 152.

3. We must also note that this Court has assumed original jurisdiction in a dispute where a Governor's activities were questioned, raising an issue of constitutional and statutory interpretation. *Hendrick v. Walters,* 1993 OK 162, 865 P.2d 1232. This controversy similarly rests upon statutory interpretation.

authorized by the statute at 47 O.S.Supp.1992 § 2–101(b), in relevant part as follows:

> The Commissioner of Public Safety shall provide personal security and protection, transportation, and communications capabilities for the Governor, the Governor's immediate family, and the Lieutenant Governor.

¶ 12   The Department provides a car designated as the "Governor's car" for the Governor to use as transportation. DPS occasionally provides the Governor with an Oklahoma Highway Patrol cruiser for the purpose of transportation. It also provides the Governor with an aircraft for transportation purposes.

¶ 13   The facts, as stipulated by the parties, show that the Governor used the Governor's car and the DPS aircraft to attend meetings held for the purpose of raising funds for entities affiliated with a political party and raising funds for individuals campaigning for various public offices. They describe one instance of the Governor using an Oklahoma Highway Patrol cruiser for this purpose. The stipulation describes five fundraisers by the Oklahoma State Republican Committee (Oklahoma State Republican Party), Oklahoma State House of Representatives Republican Committee, and the Oklahoma State Republican Senatorial Committee, and fundraisers for twenty-nine individuals seeking political office.

¶ 14   The Ethics Commission argues that the Governor could not use the Governor's car, the DPS airplane, nor the patrol cruiser as transportation to these thirty-four events. The Governor argues that the statute and common sense allow him to use the statutorily-provided transportation for these events.

¶ 15   The Ethics Commission Rule appears to apply on its face when the Governor is transported to a fundraiser: "A person shall not use ... public ... property ... in any solicitation of funds for or against a candidate for state office...." The vehicles are state property and they were used to directly assist the Governor in participating in the campaign fundraisers. But the Rule does not stop here—it also contains an exception from its application, and the Governor claims that this exception applies to him. Rule 10–1–3 has a subsection which says:

> (h) This section, except for Subsection (e), does not apply to:
>
> (1) **activities that are a part of the ordinary conduct of the governmental entity;** and
>
> (2) nonpartisan voter registration activities.

74 O.S.Supp.1995, Ch. 62, App., Rule 257:10–1–3(h), (emphasis added).

The Governor and the Commission disagree on how this exception should apply in this case.

¶ 16   The Commission's brief states:

> The Commission submits that subsection (h) applies not to DPS, but only to the "persons" under the prohibition of 10–1–3(a)—here, the Governor. Thus, the conduct of the department of its Commissioner is not germane.

The Commission notes that 10–1–3(a) prohibits the Governor from using DPS transportation to attend partisan political events. The Commission then argues that 10–1–3(h) applies to "persons" whose conduct violates 10–1–3–(a). The Commission further argues that 10–1–3–(h) would apply in this case only if the Governor's presence at partisan political events was an official duty of the Governor's office. We disagree with this interpretation.

¶ 17   First, what Section 10–1–3(a) prohibits are certain activities a person may engage in. Section 10–1–3(a) prohibits the activity of using or authorizing the use of public funds, property, or time, in the participation, or assisting in the organization of, or preparation for, a fundraiser for a campaign, etc. Then, section 10–1–3(h) exempts "activities" and not "persons" from the application of subsection (a). Subsection (h) states that "activities" prohibited by subsection (a) are excepted from the prohibition of subsection

10–1–3(a) when the "activities are a part of the ordinary conduct of the governmental entity." The Rule requires that we look at the specific activity prohibited by subsection (a), and then subsection (h) requires that we determine if that activity is a part of the ordinary conduct of the governmental entity. The governmental entity is the Department of Public Safety. The activity prohibited is transportation of the Governor to a political fundraiser. The question then becomes whether DPS transportation provided to the Governor is a part of the ordinary conduct of the DPS when such transportation is used to attend a partisan political event.

¶ 18 We look first to the authority establishing the Governor's transportation, 47 O.S. 1991 § 2–101. Paragraph (b) of that statute states that the Commissioner of Public Safety shall provide personal security and protection, transportation, and communications capabilities for the Governor, the Governor's immediate family, and the Lieutenant Governor. This statute contains no express limitations upon the use of DPS transportation for the Governor. In construing statutes we look to the language to determine if the legislative will is clear and unambiguous.

*Cox v. Dawson,* 1996 OK 11, 911 P.2d 272, 276. There are no express limitations in the specific statute authorizing the Governor's use of DPS transportation.

¶ 19 Further, we cannot conclude that the language of § 2–101 prohibits the Governor from using DPS to travel to a destination where activities occur that are unrelated to his official duties. First, the general statute governing state-provided transportation *does* have limitations upon how that transportation is used. 47 O.S.Supp.1996 § 156.1(A).[4] No such limitations occur in § 2–101, the specific statute authorizing the Governor's transportation. When we combine the legislative silence in § 2–101 on the topic of restricting the Governor, with the legislative voice imposing restrictions on other state employees in § 156.1, we must conclude that the Legislature has intended that while some officers and employees should have certain travel restrictions, the Governor is not so restricted. See *City of Duncan v. Bingham,* 1964 OK 165, 394 P.2d 456, 459–460, where we explained that legislative silence, when it has authority to speak, may be considered as giving rise to an implication of legislative intent.[5]

4. 47 O.S.Supp.1996 § 156.1(B) states:

A. It shall be unlawful for any state official, officer, or employee, except any essential employees approved by the Governor and those officers or employees authorized in subsection B of this section, to ride to or from the employee's place of residence in a state-owned automobile, truck, or pickup, except in the performance of the employee's official duty, or to use any such automobile, truck, ambulance, or pickup for other personal or private purposes.
B. 1. Any state employee, other than the law enforcement officers provided for in paragraph 2 of this subsection, who receives emergency telephone calls regularly at the employee's residence when the employee is not on duty and is regularly called upon to use a vehicle after normal work hours in response to such emergency calls, may be permitted to use a vehicle belonging to the State of Oklahoma to provide transportation between the employee's residence and the assigned place of employment, provided such distance does not exceed seventy-five (75) miles in any round trip or is within the county where the assigned place of employment is located.
2. Any employee of the Department of Public Safety, Oklahoma State Bureau of Narcotics and Dangerous Drugs Control, Oklahoma State Bu-

reau of Investigation, Alcoholic Beverage Laws Enforcement Commission, Oklahoma Horse Racing Commission, Office of the Inspector General within the Department of Human Services or Office of the State Fire Marshal, who is a law enforcement officer, or any employee of a district attorney who is a law enforcement officer, may be permitted to use a state-owned vehicle to provide transportation between the employee's residence and the assigned place of employment and between the residence and any location other than the assigned place of employment to which the employee travels in the performance of the employee's official duty.
3. The Director, department heads and other essential employees of the Department of Wildlife Conservation, as authorized by the Wildlife Conservation Commission, may be permitted to use a state-owned vehicle to provide transportation between the employee's residence and the assigned place of employment and between the residence and any location other than the assigned place of employment to which the employee travels in the performance of the employee's official duty.

5. We note that during the pendency of this litigation the Legislature has imposed travel limits upon all persons using aircraft owned, leased,

¶ 20 We must also note that a similar result was reached by the Oklahoma Attorney General where he concluded that the state-provided transportation could not be used to transport persons to political rallies other than those persons specified in § 2–101. The Attorney General said:

> The responsibility of the Commissioner of Public Safety, under 47 O.S.1991, § 2–101, to provide the Governor and his immediate family with transportation, is to transport the Governor and his immediate family from place to place. In meeting this responsibility, neither the State-owned airplane nor vehicles may be used for other non-State purposes, such as for transporting persons other than the Governor and his immediate family for non-State-business purposes, such as to a political rally, private business meetings, and the like. Nor, may the State airplane or vehicles be used to display campaign bumper stickers, signs, corporate logs, or for other non-State-business purposes.

A.G. Opin. 97–72, at ¶ 22.

¶ 21 In sum, the language of the statute and the discernable intent of the Legislature indicate no limitation upon the Governor's use of the DPS-provided transportation to attend partisan political events. It would thus appear at this point that the DPS-provided transportation to the political event is an activity occurring as a part of the ordinary conduct of the Department of Public Safety.

¶ 22 The Commission argues that the transportation was not occurring as a part of the ordinary conduct of a governmental entity. In support of its argument the Commission relies upon the Oklahoma Constitution, Art. 10 §§ 14, 17, 19.[6] The Commission's arguments from these sections of the Oklahoma Constitution may be summarized in one proposition, namely, that the Governor's transportation to a partisan political event is not transportation for a public purpose. The Commission's arguments characterize the Governor's transportation as fulfilling a private purpose. One problem with this analysis is its method of determining which activity is, and is not, for a public purpose.

¶ 23 The Commission looks at the activity of the official at the destination to determine if transportation is for a public or private purpose. It reasons that a partisan political event is not an official duty of the office of the Governor, and thus transportation by the Governor to such event is private and not authorized. We must first note that when the Legislature enacted § 156.1 it declined to adopt the Commission's definitions of a "public purpose." Further, we must conclude that the definition used by the Commission is overly restrictive.

¶ 24 These two conclusions are illustrated by examining the type of transportation authorized by § 156.1. For example, § 156.1 states that a state employee who receives

chartered, or operated by the State. These limitations are found in H.B. No. 3226 passed by the Oklahoma Senate on April 1, 1998, by the Oklahoma House of Representatives on April 27, 1998, and signed by the Governor on April 29, 1998. It shall be codified at § 500.6 of Title 74, Oklahoma Statutes. The terms of the Bill state that it shall take effect upon its passage and approval, and thus it has no effect upon this controversy.

**6.** Okla. Const. Art. 10 § 14 states:
*Taxes shall be levied and collected by general laws, and for public purposes only,* except that taxes may be levied when necessary to carry into effect Section thirty-one of the Bill of Rights. Except as required by the Enabling Act, the State shall not assume the debt of any county, municipal corporation, or political subdivision of the State, unless such debt shall have been contract-

ed to defend itself in time of war, to repel invasion, or to suppress insurrection.
(Emphasis added).
Okla. Const. Art. 10 § 17 states:
The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual.
Okla. Const. Art. 10 § 19 states:
Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.

emergency telephone calls regularly at the employee's residence while not on duty, and is thus called upon to use a vehicle in response to the emergency calls, may use a state vehicle for transportation to and from the employee's residence. *Id.* § 156.1(B)(1). If we were to adopt the Commission's analysis we would examine the conduct of the employee at the point of destination to determine if it was an official duty of the employee. If not, the transportation was not for a public purpose and it would violate the Oklahoma Constitution.

¶ 25 The Governor is the chief officer of the Department of Public Safety (§ 2–101), and he states that the DPS transportation is, in the exercise of his statutory discretion, a permissible means of responding to emergency calls and making himself available to perform the duties of his office regardless of his location. In other words, the Governor does not stop being the Governor at 5:00 p.m. He is Governor twenty-four hours a day, and must respond to the duties of his office whenever they arise.

¶ 26 It is common knowledge that certain law enforcement employees use their vehicles for transportation to and from their homes. They do not travel to their residences for the purpose of fulfilling an official duty. The Commission thus asks us to adopt a view of the Oklahoma Constitution that would make statutes authorizing this practice to be unconstitutional.[7] But clearly, § 156.1 indicates that government transportation to a destination (private residence) for a private purpose (to go home at the end of the work-day) does in fact fulfill a public purpose, because the employee responds to emergencies from the residence. The Legislature has indicated in § 156.1 that the public receives a public benefit in having employees timely respond to emergencies related to the performance of their official duties. The same may be said with regard to the Governor in § 2–101, since the Legislature has not imposed restrictions on the Governor's travel.

¶ 27 But is § 2–101 nevertheless unconstitutionally applied by the Governor when he uses DPS transportation to attend a political fundraiser? In other words, is the public purpose of the Governor's being able to respond to emergencies and being constantly accessible to the institutions of government in some way less of a public purpose when he attends a fundraiser? The answer to this question must be in the negative.

¶ 28 The public purpose of DPS transportation is not lessened by the fact that the Governor travels to a destination for a private purpose. His duties to respond as Governor are not lessened by the fact that he travels to a destination for a private purpose, nor by where in the state he is located.[8] Disasters are not unknown in this state. They are not pre-scheduled for the benefit of a timely government response, and neither do they necessarily occur within the regularity of a forty-hour work-week. See for example 63 O.S.1991 § 683.8.[9] Similarly, our

---

7. This is so because the Commission argues that the Oklahoma Constitution *requires* courts to examine the activities of the state employee or official at the point of destination, and the Commission makes no argument why in its view a *required* rule of constitutional interpretation would be applied unequally so as to prohibit the Governor from driving to a private destination but not apply to law enforcement officials when they drive to a private destination.

8. This controversy does not involve the Governor using publicly funded transportation outside the State while the Lieutenant Governor is fulfilling the duties of the Governor. See Okla. Const. Art. 6 § 16. We need not, and do not, address this circumstance since this Court grants declaratory relief to adjudicate justiciable controversies and not hypothetical ones. *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069, 1073.

9. 63 O.S.1991 § 683.8 states:

(a) The Governor shall have general direction and control of the Civil Defense Agency and shall be responsible for carrying out the provisions of this act and, in the event of disaster beyond local control, may assume direct operational control over all or any part of the civil defense or emergency functions within this state.

(b) The Governor shall have general direction and control of the Emergency Resources Management within the state and all officers, boards, agencies, individual or groups established under the Emergency Resources Management Plan. The Governor shall have the authority under this act to establish such offices, boards, agencies, or

State Constitution provides that: "The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as prescribed by law, all intercourse and business of the State with other states and with the United States, **and he shall be a conservator of peace throughout the State.**" Okla. Const. Art. 6 § 8 (emphasis added). We conclude that the DPS transportation does not violate the Oklahoma Constitution when used by the Governor to attend a political event.

¶ 29 Once we conclude that providing the Governor with DPS transportation fulfills a public purpose although the destination is unrelated to his official duties, we must necessarily again conclude that the public purpose fulfilled by providing such transportation is one of those "activities that are a part of the ordinary conduct of the governmental entity." The DPS transportation used by the Governor to attend a partisan political event is thus first prohibited by Commission Rule 10–1–3(a), but then exempted by Rule 10–1–3(h).

¶ 30 Our conclusion is that the transportation provided to the Governor by the Department of Public Safety did not violate the Rule of the Ethics Commission, and the Commission's construction of its Rule is not required by the Oklahoma Constitution. We conclude that the Oklahoma Constitution was not violated, and we reject the Commission's definition of a "public purpose" for measuring the constitutionality of statutes providing government-funded transportation.

### III.

### THE ETHICS COMMISSION LACKS POWER TO REGULATE THE GOVERNOR'S SECURITY

■ ¶ 31 There is yet another reason why the Governor must prevail in this controversy. An important *publici juris* issue

positions as may be necessary to carry into effect the Emergency Resources Management Plan.
(c) In performing his duties under this act, the Governor is authorized to cooperate with the

before us is whether the Ethics Commission has the power to regulate the Governor's security arrangements when the Governor participates in partisan politics. The Governor urges that adequate security is impossible if the Rule is followed as interpreted by the Commission, that his transportation is for the purpose of security even when attending partisan political activities, and that provisions concerning the security of the Governor are within the law-making power of the Legislature, as opposed to the rule-making power of the Commission.

■ ¶ 32 The Ethics Commission is empowered by Oklahoma Constitution, Art. 29 § 3, to promulgate rules of ethical conduct for state officers and for campaigns for elective state office. Because of the constitutional underpinning of these Rules we believe they have no less weight than statutes. *See Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069. Of course newly approved, modified, and repealed rules of the Commission are subject to disapproval by joint resolution of the Legislature and subsequent veto by the Governor. *Id.* 1993 OK 37 at ¶ 19, 850 P.2d 1069; Okla. Const. Art. 29 § 3.

¶ 33 On the other hand, the Ethics Commission cannot usurp the power of the Legislature in matters over which the Commission has no constitutional grant of power. For example, in *Ethics Commission of State of Okla. v. Cullison, supra,* we discussed the Legislature's amendment to 74 O.S.1991 § 4218, a statute that provided an income tax deduction for persons contributing to a political party or candidate. We explained that the statute did not violate the grant of power to the Ethics Commission, because the Commission had no authority over tax deductions, even if they involved contributions to campaigns. *Id.* 1993 OK 37 at ¶ 23, 850 P.2d at 1077.

¶ 34 Rule 10–1–3(a) prohibits the use of public funds for a fundraiser for a campaign.

federal government, with other states, and with private agencies in all matters pertaining to the civil defense of this state and of the nation and the emergency management of resources.

The Commission urges that the rule prohibits public *transportation* to a fundraiser. But the Rule is not limited to the prohibition of transportation. The governor's security and communications capabilities, insofar as he uses them en route to and while participating in a political fundraiser, implicate the use of public funds every bit as much as his transportation. A literal reading of the Rule, if it is valid as to the Governor, is that he is forbidden to use public funds when he participates in a fundraiser, whether those funds be for security, transportation, or communications capabilities.

¶ 35 The Ethics Commission argues that security and communications capabilities may be split from transportation in applying the Rule. The Commission argues that a DPS cruiser and patrolman may follow behind the Governor's private car and provide the security and communications needs of the Governor without violating the Rule. The Commission would thus draw a distinction between the Governor's use of transportation and his use of security. But the plain language of subsection (a) would prohibit both in political campaigning.

¶ 36 The same may said with the Commission's view of communications capabilities. The Commission points to the language in § 2–101 that authorizes installing state-owned communications equipment in a private vehicle. Could state-owned equipment in a private vehicle be used by the Governor while campaigning? Again, the plain language of the Rule would prohibit this practice if applied consistently by the Commission.

¶ 37 The Commission argues that it may treat security, transportation, and communications as severable items, and apply its Rule

solely to the Governor's transportation. No Commission rule makes these items severable. Rather, the Commission relies upon two statutes, 47 O.S.Supp.1992 § 2–101, and 47 O.S.Supp.1994 § 2–105.

¶ 38 Section 2–101 merely states that transportation, security, and communications capabilities are to be provided to the Governor, and that state-owned communications equipment may be installed in a private vehicle. As we said earlier, nothing in the express language of § 2–101 or the Oklahoma Constitution either requires or allows the Commission to treat these items differently.

¶ 39 Section 2–105 states that "No member of the Oklahoma Highway Patrol while in the performance of the member's assigned duty of providing security and protection shall be considered as participating in a political campaign." [10] This language contains nothing characterizing acts of a Governor. In short, these statutes do not support the argument by the Ethics Commission that security and communications should be treated differently than transportation.

¶ 40 In our view, the Commission does not possess the authority to determine the manner or method of security provided by a governmental entity to state officials. The Legislature has the power to provide the Governor with transportation, security arrangements, and communications capabilities.

> The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever.

Okla. Const. Art. 5 § 36.

No provision of the Oklahoma Constitution has been cited by the Commission that would

---

**10.** In 1990 the Ethics Commission was given the constitutional power to regulate the ethical conduct of campaigns for elective state office. Okla. Const. Art. 29 § 3. Section 2–105 defines the assigned duties of a member of the Highway Patrol giving security and protection as not participating in campaign activities. Section 2–105 predates the grant of power to the Ethics Commission. 47 O.S.Supp.1983 § 2–105, eff. June 23, 1983. We are not called upon in this controversy to determine the continued validity of this statute. However, we do note that the Ethics Commission is asserting in this proceeding that a statute, § 2–101, enacted prior to the creation of the Ethics Commission, is subject to the regulatory power of the Ethics Commission. The Commission has not pointed to any of its rules that expressly state language similar to § 2–105.

strip from the Legislature its power to provide these services to the Governor.

¶ 41  The Commission, however, concedes that the Governor needs public vehicles for security reasons, and offers a way he could modify his security plan in order to conform to the Commission's Rule.  It suggests that security vehicles could travel with the Governor to fundraisers so long as he doesn't ride in them.  The Governor says this is lacking in ˉcommon sense.  He also points to and relies upon a study performed by the U.S. Secret Service assessing proper security measures for the State Capitol and the Governor's Mansion.  For example:

> It is apparent that effective "part time" security cannot exist.  A potential assassin or group of assassins/terrorists need only observe a protected person's activities for a period, or the security routine at a government facility, and then attack at a time of greatest vulnerability.  Protection must be a 24–hour a day, seven days a week operation.  Any other method is a waste of manpower and resources.

U.S. Secret Service, Security Survey of the Oklahoma State Capitol and Governor's Mansion, at p. 4, (1987).

He then argues that the Commission's interpretation of its rule strips him of the security recommended by the U.S. Secret Service.

¶ 42  The essence .of the Commission's view is that the Governor's security may be regulated by Commission rule when that security takes place during campaign activities.  In *Ethics Commission v. Cullison, supra,* we examined the nature of the legislation to determine if it involved a subject within the power or authority granted to the Commission pursuant to Article 29 of the Oklahoma Constitution.  Article 29 of the Oklahoma Constitution contains no express provision giving the Commission the authority to make judgments as to the type or nature of security arrangements provided to public officials.  The Commission has not pointed to anything showing an expertise by the Commission in matters of security for public officials.

¶ 43  A statute which we upheld in *Cullison* was not merely a tax statute, but one that involved campaign contributions.  We said that the statute was beyond the Commission's power to alter by Commission rule.  *Ethics Commission v. Cullison,* 1993 OK 37, at ¶ 23, 850 P.2d at 1077.  We conclude that just as an income tax statute involving campaign contributions was beyond the authority of Ethics Commission to alter, so too, a statute providing the Governor with security arrangements used in campaigning is also beyond the power of the Ethics Commission to alter by application or interpretation of this Rule.  *Ethics Commission v. Cullison, supra.*  As to the Governor, the statute must trump the Rule.

## IV.

## FEDERAL CONSTITUTIONAL CLAIM

■  ¶ 44  The final claim of the Commission is that the DPS transportation, in the form of security arrangements or otherwise, violates the First and Fourteenth Amendments to- the U.S. Constitution.  The Ethics Commission argues that the Governor has the discretion to refuse security transportation while campaigning, and that he is constitutionally required to do so.  The Commission relies upon *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), where government employees objected to public-sector unions charging compulsory fees for a number of activities that were economic, political, professional, scientific and religious in nature of which they did not approve, and in which they had no voice, and which were not part of the union's collective bargaining activities.  The *Abood* holding was explained in *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

> Still later, in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), we found no constitutional barrier to an agency shop agreement between a municipality and a teachers' union insofar as the agreement required ev-

ery employee in the unit to pay a service fee to defray the costs of collective bargaining, contract administration, and grievance adjustment. The union, however, could not, consistently with the Constitution, collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent. In neither Allen nor Abood, however, did the Court find it necessary further to define the line between union expenditures that all employees must help defray and those that are not sufficiently related to collective bargaining to justify their being imposed on dissenters.

*Id.* 475 U.S. at 294, 106 S.Ct. 1066, quoting, *Ellis v. Railway Clerks,* 466 U.S. 435, 447, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984).

A similar case is *Keller v. State Bar of California,* 496 U.S. 1, 13, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), where the Court said that "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective bargaining."

¶ 45 The Ethics Commission argues that DPS is publicly funded, that the Governor's use of public vehicles is for political purposes, and that public funding of campaigns or partisan political activity is unconstitutional. The U.S. Supreme Court, however, apparently views financing via a public appropriation to be different in character from an enforced individual contribution to a particular cause.

¶ 46 In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), there was a challenge to the public financing of campaigns by using the Religion Clauses of the First Amendment, and the challengers argued that just as the government "may not aid one religion to the detriment of others or impose a burden on one religion that is not imposed on others . . . ." so too, the government could not assist particular campaigns. *Buckley,* 424 U.S. at 92, 96 S.Ct. 612. But the Court explained that the assistance was by congressional act to facilitate and further

First Amendment values. *Id.* 424 U.S. at 92–93, 96 S.Ct. 612. It stated that the government financing did not violate the equal protection component of the Fifth Amendment, and explained that its Fifth Amendment analysis was the same as that required by the Fourteenth Amendment. *Id.* 424 U.S. at 93, 96 S.Ct. 612. The Court also noted that:

> Our statute books are replete with laws providing financial assistance to the exercise of free speech, such as aid to public broadcasting and other forms of educational media, 47 U.S.C. §§ 390–399, and preferential postal rates and antitrust exemptions for newspapers, 39 C.F.R. § 132.2 (1975); 15 U.S.C. §§ 1801–1804.

*Buckley,* 424 U.S. at 94, n. 128, 96 S.Ct. 612.

*Buckley* thus shows that government funding of speech does not necessarily violate the U.S. Constitution.

¶ 47 One state court has recognized that public funding of political speech is allowed pursuant to *Buckley.* *State v. Republican Party of Florida,* 604 So.2d 477 (Fla.1992). The *Abood* claim raised therein did not prohibit public funding per se, but required that the funding not be necessarily derived from a group of individuals including those with opposing political views. In *State v. Republican Party of Florida, supra,* a statutory 1.5 percent assessment was made upon certain political party contributions, and those funds were then used to fund certain candidates. The assessment on political contributions could thus be used to support candidates with views in opposition to those who made the contributions. The court said:

> While publicly funding candidates advances the interest put forth by the State and does not abridge First Amendment values, *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), singling out political parties and associations to support the fund bears no relationship to the interest advanced. There are equally effective means of supporting the trust fund without infringing on the appellees' constitutional rights, such as devoting a

larger percentage of the filing fees to the fund or supporting the fund through general revenues.

*Id.* 604 So.2d at 480, note omitted.

*Buckley* and *Republican Party of Florida* thus show that public funding of political speech does not necessarily violate the U.S. Constitution, particularly if funded through general revenues.

¶ 48   The *Abood* argument made by the Commission is that government funding of political speech (i.e., the Governor's use of public vehicles) via tax revenues necessarily violates the Constitution because some taxpayers may object to the content of that publicly-funded speech.   A person has a First Amendment right to a particular political belief, but the preservation of that right does not necessarily entail stripping public funding appropriated for the use of public individuals who articulate opposing political beliefs.   Indeed, some forms of government-funded speech are protected by the First Amendment from government restrictions. See *FCC v. League of Women Voters of California,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), where the Court held that a provision of the Public Broadcasting Act of 1967 violated the First Amendment when it forbade editorializing by noncommercial television and radio stations receiving federal funds.

¶ 49   A proper challenge to the public funding in controversies of this nature is not whether particular taxpayers find such funding objectionable because it violates their personally held beliefs, but whether the funding fulfills a proper exercise of legislative power in accordance with our State and Federal Constitutions, and whether the funding is consistent with the federal constitutional right at issue.   The Commission's brief seeks to justify its Rule as a valid limitation on political speech because the Governor's "speech" results from government-funded transportation that does not fulfill a proper exercise of legislative power.   But we have concluded that the transportation in the form of security arrangements does fulfill a proper exercise of legislative power as contemplated in the statutes and our Constitution.

¶ 50   It may well be that DPS—provided security/transportation furthers the Governor's political speech when he uses such transportation to attend political events.   But the method selected shows that the funding does not violate taxpayers' federal constitutional rights.   DPS transportation for the Governor is funded from the general revenues.   In *State v. Republican Party of Florida, supra,* that court suggested that supporting political speech from "general revenues" was a possible constitutionally permissible solution.   *Id.* 604 So.2d at 480.   The Commission has not shown otherwise in our case today.   Thus, the Commission's *Abood* claim that allowing DPS transportation to be used by the Governor to attend political events necessarily denies the First Amendment rights of those with opposing beliefs is one that is without foundation.

CONCLUSION

¶ 51   We conclude that the transportation provided to the Governor by the Department of Public Safety did not violate Ethics Commission Rule 10–1–3.   We further conclude that the Rules of the Ethics Commission, insofar as they control those subjects constitutionally placed in the Commission, have no less weight than statutes.   Those Rules, however, cannot override the powers of the Legislature on subjects over which the Commission has no constitutional grant of authority.   Statutory provisions for the Governor's security are in the latter category.   Therefore, we conclude that Ethics Commission Rule 10–1–3 cannot be applied to the Governor so as to deprive him of, or dictate the form of, his security statutorily provided by the Department, within the context of the facts as stipulated.   We finally conclude that the constitutional arguments of the Ethics Commission are without merit.   Declaratory relief is granted to the extent of, and consistent with, this opinion.

¶ 52   SUMMERS, V.C.J., and HODGES, LAVENDER, HARGRAVE, JJ., concur.

¶ 53   WATT, J., concurs specially.

¶ 54   KAUGER, C.J., concurs in result.

¶ 55   ALMA WILSON, J., dissents in part.

¶ 56   SIMMS and OPALA, JJ., dissent.

WATT, Justice, concurring specially:

¶ 1   I concur in today's pronouncement by the majority because I believe the security of our Chief Executive which is clearly set forth by statute cannot be overridden by rule of the Ethics Commission.  The competing public policies of providing security for our Chief Executive and enforcing ethical standards for political candidates are both essential in today's society.

¶ 2   Our Governor, regardless of party affiliation, becomes Chief Executive when the oath of office is administered and remains Chief Executive until a subsequent oath of office is administered to another.  Scheduling of gubernatorial appearances takes place months in advance and most, if not all, trips away from the Capitol will involve more than one appearance or engagement.  Often, unexpected events, emergencies or natural disasters will dictate last minute changes or cancellation of appearances.

¶ 3   I am also mindful that all candidates are subject to and must comply with those ethical standards set forth by the Ethics Commission.  In balancing these competing public policies, one thing remains constant, that being the security for our Chief Executive on a twenty-four hour a day basis.

1.   *Cox v. Dawson,* 1996 OK 11, 911 P.2d 272, 281; *City of Oklahoma City v. Oklahoma Tax Comm'n,* 1990 OK 27, 789 P.2d 1287, 1292; *State v. Goforth,* 1989 OK 37, 772 P.2d 911, 914; *Maule v. Independent School Dist. No. 9,* 1985 OK 110, 714 P.2d 198, 203; R. Aldisert, "Hard Core Judicial Process Problems Facing Judges in the 89's", p. 34 (1982).

2.   11 C.F.R. § 9034.7 (1998); 5 C.F.R. § 734.503 (1998).

3.   Just this week, the Legislature has moved to limit the use of state-owned aircraft for travel to and from partisan party events by passing H.B. No. 3226.  The bill will be codified as 74

¶ 4   The solution to these competing public policies, if any there be, is one for the Legislature, should they chose to do so.

¶ 1   KAUGER, Chief Justice, with whom HODGES, Justice, joins, concurring in result:

¶ 2   If the Ethics Rule were the only authority addressing the issue, it would control.  However, I concur with the majority that the unseverable power to regulate the Governor's security and transportation is vested in the Legislature, and that it cannot be overridden by the Ethics Commission.  Under Oklahoma law, the Legislature is in a unique position to balance the two equally valid but competing public policy considerations of the Ethics Commission by placing statutory limitations on transportation and security by modifying the Ethics Commission Rules.  However, the Legislature has exercised its authority in such a way that it has left a statutory lacuna[1] insofar as the way in which legitimate gubernatorial travel and security considerations relate to the need to ensure that public resources are not used for political campaign and personal travel.

¶ 3   If the Legislature chooses further to exercise its power, it may provide, as has the Congress in regard to the President's security and transportation,[2] that expenses incurred during political campaigns be reimbursed, and that expenses be pro rated when personal, political, and official appearances are intermingled.[3]

ALMA WILSON, Justice, with whom OPALA, Justice, joins, dissenting in part:

O.S.Supp.1998 § 500.6A.  The bill was passed by the House of Representatives on April 27, 1998, and by the Senate on April 1, 1998.  It was signed by the Governor on April 29, 1998, taking full force and effect upon its approval.  Section 2 of H.B. No. 3226 is an emergency clause providing:

"It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval."

*Ethics Comm'n v. Cullison,* 1993 OK 37, 850 P.2d 1069, is not contrary to today's opinion.

¶1 *Ethics Commission v. Cullison*[1] determined that the Ethics Commission has primary legislative power to regulate ethical conduct of state officials. *Cullison* struck down 37 statutes because the Legislature encroached upon the legislative power of the Ethics Commission. The same pen that wrote *Cullison*, today, declares that the constitutionally-vested legislative power of the Ethics Commission is restricted by a 25-year old statute.[2] The majority opinion is inconsistent with *Ethics Commission v. Cullison.* Accordingly, I respectfully dissent in part.

SIMMS, Justice, dissenting:

¶1 I would not assume original jurisdiction. The parties are merely seeking an advisory opinion from this Court by way of an action for declaratory judgment which we do not have the jurisdiction to render. A fairly concise summary of my views of these matters is set forth in my opinion in *Keating v. Johnson*, 1996 OK 61, 918 P.2d 51, 61, specially concurring to the Court's refusal to assume original jurisdiction in a similar situation.

OPALA, Justice, with whom ALMA WILSON, Justice, joins, dissenting.

¶1 The court holds today that when the Governor uses a publicly funded state vehicle to travel to a partisan political fund raiser, he *does not violate* Ethics Commission [Commission] Rule 10–1–3(a), which proscribes the use of public funds, property, and time to participate in fund raising events for political campaigns or in races of candidates for state office.[1] The opinion's rationale rests upon the authority conferred by 47 O.S.1991 § 2–101(b).[2] In my view, the pronouncement clearly is contrary to the explicit mandate of Rule 10–1–3 and to the constitutional under-

---

There the Legislature improperly acted in the role of the Commission in drafting its own set of ethics rules. We also said that the Legislature's power in other areas was not diminished by the creation of the Ethics Commission. The recent legislation, like 47 O.S.Supp.1992 § 2–101, is within the power of the Legislature.

1. 1993 OK 37, 850 P.2d 1069. *Cullison* interpreted Art. 29 that was added to the Oklahoma Constitution at an election held on September 18, 1990.

2. The majority concludes that 47 O.S.1991, § 2–101(b), added by 1983 Okla. Sess. Laws, ch. 302, § 1, to require that the Commissioner of Public Safety provide personal security and protection, transportation and communications capabilities to the Governor, controls over Ethics Commission Rule 257:10–1–3(a) which prohibits the use of public property to raise political campaign funds. Following our reasoning in *Cullison*, we should read 47 O.S.1991, § 2–101(b) to require that the Commissioner of Public Safety provide transportation to the Governor, except as proscribed by Rule 257:10–1–3(a).

It is noted that the 1998 Oklahoma Legislature passed Enrolled House Bill No. 3226, which the Governor signed on April 29, 1998. The measure prohibits any person from traveling on any aircraft owned, leased, chartered, or operated by the state to attend any political event; any event for *compensation, except the state salary; or,* any event requiring an admission fee or donation, except charitable events. The measure restricts non-essential governmental use of aircraft by any person at the state's expense. The mea-

sure does not amend 47 O.S.1991, § 1–201(b). Further, the measure does not explicitly regulate ethical conduct of state officials. Although the measure is not before us, my reading of 47 O.S. 1991, § 1–201(b) limited by Rule 257:10–1–3(a) would be consistent with the new measure, as well as our opinion in *Cullison.*

1. The text of 74 O.S.Supp.1996, Ch. 62, App., § 257:10–1–3(a) states:

A person shall not use or authorize the use of public funds, property, or time, to participate or assist in the organization of or preparation for a fundraiser for a campaign or in any solicitation of funds for or against a candidate for state office or a ballot measure.

2. The pertinent provisions of 47 O.S.1991 § 2–101 are:

(b) The Governor shall be the chief officer of the Department of Public Safety and the Commissioner of Public Safety shall execute the lawful orders of the Governor and shall be responsible to him for the operation and administration of said Department. The Commissioner of Public Safety shall provide personal security and protection, transportation, and communications capabilities for the Governor, the Governor's immediate family, and the Lieutenant Governor. The Commissioner is authorized to provide necessary communications equipment to said persons even if said persons are not on state property or in state vehicles.

pinnings on which it rests. *What is worse and most tragic, today's declaration of the norms that affect the Governor's conduct places him above the law of the State.*

¶2 Rule 10–1–3 narrows the range of activity that may seem permissible under the provisions of 47 O.S.1991 § 2–101 (with respect to the Governor's use of transportation), and fills the interstices left by that section's seemingly open-ended texture. When § 2–101 is viewed together with both the fundamental laws' requirement that public funds be used solely for public benefit—which is prescribed by Art. 10 §§ 14, 15, 17 & 19, Okl. Const.[3]—and with the language of 47 O.S.Supp.1996 § 156.1[4] that restricts the personal use of state transportation by state employees, the command of Rule 10–1–3 is crystal-clear. I would hence *construe* § 2–101 and § 156.1 together with Art. 10 §§ 14, 15, 17 & 19, Okl. Const., and *also* with Rule 10–1–3, *as one harmonious whole that* (1) *confines* the Governor's use of state transportation to official duties and (2) *excludes* from that use travel to partisan political fund raisers. I would treat the *restrictive text* of Rule 10–1–3 and *the nearly open-ended authorization* in § 2–101(b) as legal norms *in pari materia* and would hold that § 2–101

authorizes publicly provided transportation only for the Governor's official duties. I would then direct that, on this cause's termination, the Commission hold hearings to decide if the Rule 10–1–3 restrictions, when viewed together with other pertinent legislative and constitutional norms *in pari materia* to be considered, gave the Governor adequate advance notice that the Rule's commands were efficacious. Advance notice is sufficient when it fully advises a reasonable person in intelligible terms of what conduct is legally interdicted. If, at the conclusion of these proceedings, the Commission should determine the Governor *did not* have adequate advance notice that the Rule 10–1–3 standards were in force, I would exonerate him of their breach.

¶3 Should the Commission determine that the Governor *did* have adequate advance notice to conform his conduct to the Rule 10–1–3 requirements, he should be ordered to pay the penalty set by the parties' agreement. I would apply my pronouncement to this case, to all like controversies now pending before judicial or administrative tribunals, to those presently in the appellate litigation process, and *prospectively* to all controversies over like or identical ethics issues to arise from acts, conduct, or omissions

---

3. Art. 10 § 14, Okl. Const., states in part: "Taxes shall be levied and collected by general laws, and for public purposes only...."

   Art. 10 § 15, Okl. Const., states in part: "the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association...."

   Art. 10 § 17, Okl. Const., states: "The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual."

   Art. 10 § 19, Okl. Const., states: "Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

4. The pertinent language of 47 O.S.Supp.1996, § 156.1 provides:

   A. It shall be unlawful for any state official, officer, or employee, except any essential em-

ployees approved by the Governor and those officers or employees authorized in subsection B of this section to ride to or from the employee's place of residence in a state-owned automobile, truck, or pickup, except in the performance of the employee's official duty, or to use any such automobile, truck, ambulance, or pickup for other personal or private purposes. B. 1. Any state employee, other than the law enforcement officers provided for in paragraph 2 of this subsection, who receives emergency telephone calls regularly at the employee's residence when the employee is not on duty and is regularly called upon to use a vehicle after normal working hours in response to such emergency calls, may be permitted to use a vehicle belonging to the State of Oklahoma to provide transportation *between the employee's residence and the assigned place of employment,* provided such distance does not exceed seventy-five (75) miles in any round trip or is within the county where the assigned place of employment is located. (emphasis added).

occurring *after* the court's opinion will have become final.

## I.

## TAKING ORIGINAL COGNIZANCE OF THIS DISPUTE IS APPROPRIATE

¶ 4 The Governor and the Commission request that this court assume original jurisdiction to resolve the pending controversy between them. Its early settlement is urgently needed. Art. 7 § 4, Okl. Const., confers on this court the power to invoke its original cognizance [5] to resolve conflicts between coordinate branches of government.[6] I hence join the court only insofar as it concludes that this matter is properly before us.

## II.

## THE COMMISSION'S RULE 10–1–3 CONCRETIZES THE RANGE OF PERMISSIBLE STATUTORY NORMS PRESCRIBED IN THE TERMS OF 47 O.S.1991 § 2–101 BY RESTRICTING THE USE OF STATE TRANSPORTATION TO THAT WHICH IS AUTHORIZED BY THE PROVISIONS OF 47 O.S.SUPP.1996 § 156.1 AND OF ART. 10 §§ 14, 15, 17 & 19, OKLA. CONST.

¶ 5 The pertinent portions of the United States Constitution, Oklahoma's Constitution, state legislative enactments, and of the effectively promulgated agency rules must be invoked to provide the foundational legal sources for today's decision. By the terms of § 2–101 the Governor is given the use of state transportation without restriction. In 1995 and 1996 the Governor used state vehicles to attend partisan political fund raisers. The Commission initiated a district court action [7] to enforce (against the Governor) its Rule 10–1–3 which forbids the use of public funds, property or time to further a fund raiser or solicitation of funds for political candidates.[8] For an analysis of the Commission's position I would begin by *reconciling* the text of § 2–101 with the terms of § 156.1 and those of Art. 10 §§ 14, 15, 17 & 19, Okl. Const. Section 156.1 *restricts the use of public transportation by all state officials and employees,* while the constitutional provisions require that public funds not be spent for private use. I would utilize the pertinent constitutional provisions cited above, those of § 2–101, and lastly the terms of § 156.1 as the critical foundational bricks and would then *concretize* [9] these basic building blocks by filling whatever open texture is present between them with the mortar provided by the Commission's Rule 10–1–3 restriction. Because the *cited Commission rule* is anchored on state and federal constitutional underpinnings, it will pass any fundamental-

---

**5.** *See* Art. 7 § 4, Okl. Const., which provides in part, "The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all agencies, commissions and boards created by law."

**6.** *See Ethics Commission v. Cullison,* 1993 OK 37, ¶¶ 2–4, 850 P.2d 1069, 1081–83 (Opala, J., concurring).

**7.** *Ethics Commission v. Keating,* No. CJ–97–4573–67 filed June 30, 1997. Proceedings in this suit are currently stayed to await this court's decision in this cause.

**8.** 74 O.S.Supp.1996, Ch. 62, App., § 257:10–1–3(a), *supra* note 1.

**9.** I use the term *"concretize"* because I view the process of administrative rule-making that sharpens the line between acceptable and nonacceptable conduct as akin to what jurisprudence does in concretizing the norms of a statute by judicial decision-making that addresses itself to specific

case scenarios. The term is derived from Hans Kelsen's General Theory of Law and State 119, 135, 397 (1945) (reprinted 1961). Kelsen explained the concept of concretization in the following passage:

"From a dynamic standpoint, the individual norm created by the judicial decision is a stage in a process beginning with the establishment of the first constitution, continued by legislation and custom, and leading to the judicial decisions. The process is completed by the execution of the individual sanction. Statutes and customary laws are, so to speak, only semi-manufactured products which are finished only through the judicial decision and its execution. *The process through which law constantly creates itself anew goes from the general and abstract to the individual and concrete. It is a process of steadily increasing individualization and concretization.*" [emphasis supplied]. *Id.* at 134–35.

For other authority referencing and defining *concretization see State v. Martin,* 532 P.2d 316, 323 (Alaska 1975) (holding that "[a]bsent judicial

law muster; *its provisions here in contest will trump all nonconformable norms in pari materia.*[10]

## A.

### THE LAW'S CONCRETIZING MORTAR: COMMISSION RULE 10–1–3

¶ 6 Although Oklahoma's Constitution creates the Commission and authorizes it to promulgate rules governing ethical norms, the rules themselves do not have the force of fundamental law. This is so because they are subject to the filtering force of legislative approval.[11] While promulgated Commission rules do not *ipso facto* rise to a constitutional dimension, Rule 10–1–3 clearly rests on and implements the fundamental law's commands in Art. 10 §§ 14, 15, 17 & 19, Okl. Const. *It hence speaks to us with the voice of the Constitution.* Moreover, this court, which is required to take judicial notice of agency rules promulgated in conformity to the Administrative Procedures Act, may not overlook the Commission rules' impact upon the

symmetry of our legal system.[12] As valid expressions of the agency's lawmaking power, the rules have the full force and effect of law.[13] New Commission rules must be presented to the Governor and to both Houses of the Legislature. If they do not draw objections, the rules are then to be printed in the official statutes.[14] *The Legislature must affirmatively act to disapprove the rules;* if a rule is to be modified or repealed, its change must be accomplished by a legislative enactment.[15] If, after promulgation of an agency rule, successive sessions of the Legislature are convened but no action is taken to accomplish a rule's rejection, silence may be regarded as proof of the lawmakers' consent.[16] Because the Governor and the Legislature failed timely to object to Rule 10–1–3 when it was initially adopted, that rule has never been disapproved, modified, or repealed.[17] *Its text must be treated as fully effective law.*

¶ 7 Brushing aside the force of law that Rule 10–1–3 represents, today's pronouncement ignores the Commission's constitutional status as an agency *entrusted with primary*

---

concretization, the ordinary citizen desiring to comply with the law would be forced to speculate" about the laws impact on him). *See also In re Grayson–Robinson Stores, Inc.,* 321 F.2d 500, 502 (2d Cir.1963) (holding that concretization uses the specific facts of a particular situation to give appropriate meaning to judicial decisions); *United States v. Articles of Drug Labeled Colchicine,* 442 F.Supp. 1236, 1241 (S.D.N.Y.1978) (construing the Federal Food and Drug Act [FFDA] to protect the lives and health of the public, the court held that the *Secretary's interpretive regulations,* as binding law, *eliminate vagueness* within the act, and *serve to clarify and concretize* the provisions of the FFDA.).

10. The State Constitution holds the highest rank in the hierarchy of norms in Oklahoma's three-source legal system. All other sources must conform to its commands. *Brock v. Thompson,* 1997 OK 127, 948 P.2d 279, 288–291; *see also Tate v. Browning–Ferris, Inc.,* 1992 OK 72, 833 P.2d 1218, 1225–1226.

11. Art. 29 § 3(C), Okl. Const., provides in part: Newly promulgated rules [of the Commission] shall be presented to each House of the Legislature and to the Governor on the second day of each session of the Legislature. If these rules are not disapproved by joint resolution, subject to veto by the Governor, during the same legislative session, they shall be effective.

12. *Cox v. Dawson,* 1996 OK 11, ¶¶ 8–10, 911 P.2d 272, 279. *See also Toxic Waste Impact Group, Inc. v. Leavitt,* 1988 OK 20, ¶ 12, 755 P.2d 626, 630; *Tulsa Area Hospital Council Inc. v. Oral Roberts University,* 1981 OK 29, ¶ 10, 626 P.2d 316, 320.

13. *See* Art. 29 § 3(B), Okl. Const., which provides, "After public hearing, the Ethics Commission shall promulgate rules of ethical conduct for state officers and employees, including civil penalties for violation of these rules." *See also* 75 O.S.1991 § 308.2(C) (giving agency rules promulgated in compliance with the Administrative Procedures Act the full force and effect of law).

14. *See* Art. 29 § 3(C), Okl. Const., *supra* note 10.

15. *See* Art. 29 § 3(D), Okl. Const.

16. *Peterson v. Oklahoma Tax Commission,* 1964 OK 78, ¶ 16, 395 P.2d 388, 391. *See also Branch Trucking Co. v. State ex rel. Oklahoma Tax Commission,* 1990 OK 41, ¶ 6, 801 P.2d 686, 689–90.

17. The Legislature had an opportunity to disapprove of, modify or repeal Rule 10–1–3 in 1994, 1995, 1996 and 1997.

*responsibility* for fashioning and enforcing ethics norms for political campaigns, candidates, and state employees. Were I writing for the court, I would hold that a Commission rule which concretizes open-ended statutory norms must—at a minimum—be accorded the same force and effect as any *in pari materia* expression of legislative will.

¶ 8 This court is powerless to *repeal* either statutory enactments or agency rules. Its task is to vitalize these sources, so far as possible, for their meaningful application. Different statutes on the same subject (or rules having the force of legislative enactments) are to be construed as a consistent whole in harmony with common sense and reason. If possible, every norm should be given effect. All provisions *in pari materia* are to be interpreted together as forming one law that will fit into a coherent symmetry of legislation.[18] *I would hence hold that because the Oklahoma Constitution does not free the Governor from the restraint of the Commission's ethical commands nor otherwise arm him with immunity from accountability for ethics breaches, the Chief Executive, like all other state officials, stands subject to the Commission's constitutional authority.*

### The Court's Assault on Rule 10–1–3 is Unfounded

¶ 9 Rule 10–1–3 does not reach *dehors* the Commission's *constitutional powers* to affect conduct by elected officials. It is not unrelated to ethics in election campaigns. Subsection (b) of Art. 29 § 3, Okl. Const., states, "[a]fter public hearing, the Ethics Commission shall promulgate rules of ethical conduct for state officers and employees, including civil penalties for violation of these rules." No text could convey a clearer expression of the Commission's authority to regulate the Governor's ethical conduct. Despite this unmistakable language, today's

pronouncement gives *primacy to* the provisions of § 2–101 as well as *to its own and plainly erroneous exegesis of § 156.1 over* the clear, authoritative and constitutionally dictated provisions of Rule 10–1–3.

¶ 10 Rule 10–1–3(a) states that "[a] person shall not use or authorize the use of public funds, property, or time, to participate or assist in the organization of or preparation for a fund raiser for a campaign or in any solicitation of funds for or against a candidate for state office or a ballot measure." [19] The court dilutes the force of Rule 10–1–3 and waters down its meaning by shifting the focus of inquiry from the *Governor's unauthorized use of* state transportation for travel to attend partisan political fund raisers to the *duty owed by the Commissioner of Public Safety to provide* the Governor with statutorily authorized transportation. Subsection (a) of Rule 10–1–3 commands that *persons* should not use public property (or money) to solicit funds for or against candidates for state offices, and subsection (h) frees from penalty for the breach those *persons* (or *governmental entities*) whose activity in question is part of that individual's ordinary conduct. Neither the Department of Public Safety nor its Commissioner is a party to this original action. The sole governmental entity proceeded against is the Governor. The court's focus on *activities* rather than *persons* (or officials) and *entities* (agencies) extracts the teeth from this Rule's bite in an effort to give the Governor unrestricted rein over publicly funded transportation, contrary to the unequivocal proscription in subsection (a).

### Today's Pronouncement Directly Contradicts Both the Spirit and the Language of this Court's 1993 Pronouncement in Ethics Commission v. Cullison[20]

¶ 11 Placing its focus on activities rather than on persons and governmental entities,

---

18. *See Prettyman v. Halliburton Co.*, 1992 OK 63, ¶ 20, 841 P.2d 573, 580; *Sharp v. Tulsa County Election Bd.*, 1994 OK 104, 890 P.2d 836, 840.

19. 74 O.S.Supp.1996, Ch. 62, App., § 257:10–1–3(a), *supra* note 1.

20. *See supra* note 6, at 1076.

the court today declares that Rule 10–1–3 attempts to override the Legislature's power over the manner and method of providing the Governor with security. In *Ethics Commission v. Cullison* this court held that the Legislature cannot usurp the Commission's rule-making authority by controlling the ethical conduct of state officials through legislative enactments. Indifferent to the stench of hypocrisy pervading today's contrary expressions, the court now *permits* its construction of § 2–101 and of § 156.1 to control the ethical conduct of state officials and to *circumvent* the Commission's *effectively promulgated and constitutionally conformable* Rule 10–1–3 commands. Without a scintilla of legal warrant the court gives the Legislature a double whammy (or a second bite of the apple, as it were) in the form of *two chances* to disapprove Commission rules: one when the new rule has been initially adopted; and another whenever a dispute arises over the efficacy of a rule that concretizes the statute. The *Cullison*-crafted *primary* authority of the Commission over ethics is today reduced to an inferior rank and its rules are placed in a status subordinate to legislation.

¶ 12   I would hold that by filling with its own concretizing mortar the interstices that lie in spaces left open between the provisions of § 156.1 and § 2–101 on the one hand, and those prescribed by Art. 10 §§ 14, 15, 17 & 19, Okl. Const., on the other hand, Rule 10–1–3 covers—in a manner conformable to the Constitution—*the wide spaces of open texture left unaddressed by the language of* § 2–101. *No legislative enactment has been contravened.* The Rule merely *serves to refine* the text of § 2–101 and to restrict public funds to publicly beneficial uses in obedience to the commands of Art. 10 §§ 14, 15, 17 &

19, Okl. Const., and to the conforming language in § 156.1.

## B.

### THE LAW'S BASIC BRICKS: 1ST & XIVTH AMENDMENTS, U.S. CONST., ART. 10 §§ 14, 17 & 19, OKL. CONST., § 2–101 AND § 156.1 OF OKLAHOMA'S STATUTORY LAW.

### *The United States Constitution Does Not Allow a State to Restrict the Full Sway of Free Speech Guaranteed by the First Amendment by Forcibly Exacted Contributions of Public Funds to Benefit Partisan Political Fund Raisers*

¶ 13   The First Amendment to the United States Constitution guarantees freedom of expression. When the Governor uses any state property to endorse partisan political speech, he *coerces* all state taxpayers to "participate in the dissemination of an ideological message" in a manner contrary to the United States Supreme Court's pronouncement in *Wooley v. Maynard.*[21] Citizens of Oklahoma may not be compelled to endorse any political platform by contributions made to a political party's campaign through the veil of publicly subsidized transportation. In *Abood v. Detroit Board of Education,*[22] the Court held that employers cannot force their employees to contribute to political campaigns. Just as it was done in *Abood,* so also here I would declare that all persons must be afforded the liberty to develop and nurse their own beliefs. *No one may be coerced, through forcibly exacted contributions, to give financial support to anyone's political campaign.*[23] The Chief Executive's conduct under today's scrutiny has much broader implication than that condemned by *Abood.* In the case at bar, it affects *every Oklahoma taxpayer* while in the cited case the High Court dealt merely with an appreciably smaller group of

---

**21.**   430 U.S. 705, 713, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977).

**22.**   431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977).

**23.**   *See Abood,* 431 U.S. at 234–35, 97 S.Ct. 1782. "For at the heart of the First Amendment is the

notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.*

union members.[24]

### The Oklahoma Constitution does not Permit the Governor's use of Public Funds for Travel to Partisan Political Fund Raisers

¶ 14 The Oklahoma Constitution, which requires that tax funds be used *only* for public benefit, imposes several restrictions upon political campaigns. The provisions of Art. 10 §§ 14, 15, 17, & 19, Okl. Const., mandate that taxes be levied and collected only for public purposes.[25] This plainly contemplates a use that is not only impressed with a public interest, but one that is to be connected with the exercise of the state's governmental functions.[26] Similarly, agencies authorized to raise money through taxation must expend it for a public purpose.[27]

¶ 15 A 1982 opinion by the Attorney General appears instructive in explaining my analysis. Considering the question there posed—whether the Oklahoma Wheat Commission could either pay Oklahoma's share of the National Association of Wheat Growers' budget or help the Oklahoma Wheat Grower's Association obtain seats on the Board of the National Association of Wheat Growers—the Attorney General reasoned that a payment would amount to an impermissible aid to a private organization. It would be a use of public funds to help a *private association* conduct its *private function* in violation of Art. 10 § 14, Okl. Const.[28] Using public funds to finance the Governor's travel to partisan political events is no less offensive to the clear mandate of Art. 10 §§ 14 and 15, Okl. Const.,[29] than the conduct disapproved of by the analysis used in the Attorney General's letter of response. An association is "[a] body of persons who have combined to execute a common purpose or advance a common cause."[30] Within the meaning of our Constitution, partisan political gatherings are "associations" that may not be assisted by public transportation used to subsidize the Governor's supportive participation. A political party clearly is an association whose activities may not be aided by tax revenue.

¶ 16 Acting in the exercise of its constitutional authority,[31] the Commission promulgated Rule 10–1–3(a) to make it consistent with the public-use-for-public-funds mandate of Art. 10 §§ 14, 15, 17 & 19, Okl. Const. When the Governor and both Houses of the Legislature failed to disapprove Rule 10–1–3, *they clothed it with the attributes equal in vigor to any validly enacted legislation.*[32] The legislators were doubtless cognizant of the Commission's constitutional source of authority to enforce its rule.[33]

¶ 17 Although today's pronouncement appears to recognize the constitutional underpinnings of the Commission rules, it accords them *less weight* than that which is due a legislative enactment. In fact, the court *subordinates* the Rule 10–1–3 text to the statutory language in § 2–101 rather than allowing the cited section's open texture to become concretized by this rule.[34]

### The Governor's Nearly Open–Ended Statutory Freedom to Use State Vehicles, Conferred on him by the Provisions of § 2–101, is Counterbalanced and Concretized by Rule 10–1–3's Restrictions.

¶ 18 The court today finds a conflict be-

---

**24.** As cited in the *Abood* decision, Thomas Jefferson believed that "'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.'" *Abood,* 431 U.S. at 235 n. 31, 97 S.Ct. 1782 (quoting I. Brant, *James Madison: The Nationalist* 354 (1948)). *See generally, Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**25.** *See supra* note 3.

**26.** *See Vette v. Childers,* 102 Okla. 140, 228 P. 145 (1924).

**27.** *Veterans of Foreign Wars v. Childers,* 197 Okla. 331, 171 P.2d 618, 622 (1946).

**28.** Op.Atty.Gen. No. 82–71 (Feb. 23, 1982).

**29.** *See supra* note 3.

**30.** 1 Oxford English Dictionary 718 (2nd ed. 1989).

**31.** *See* Art. 29 § 3(B), Okl. Const., *supra* note 12.

**32.** *See* Art. 29 § 3(C), Okl. Const., *supra* note 10.

**33.** *See* Art. 29 § 5, Okl. Const.

**34.** *See State ex rel. Turpen v. Oklahoma State Board For Property and Casualty Rates,* 1986 OK 54, ¶ 7, 731 P.2d 394, 398–99; *Ricks Exploration Company v. Oklahoma Water Resources Board,* 1984 OK 73, ¶ 14, 695 P.2d 498, 504; *Cowart v. Piper Aircraft Corp.,* 1983 OK 66, ¶¶ 4–5, 665 P.2d 315, 317.

tween the language in § 2–101 [35] on the one hand, and the Rule 10–1–3 commands on the other. Were a conflict truly present I might accede to today's pronouncement.[36] As I view the problem, the rule and the legislative enactments complement each other. *The former spells out in greater detail than the latter (and conformably to the commands of the Constitution) the permissible range of public transportation that may be provided.* Whenever diverse statutes relate to the same subject, this court will treat them as a harmonious whole and, to the fullest extent possible, *will allow each enactment's meaning to stand.*[37] It would reconcile and harmonize all rules, legislative enactments and constitutional provisions on the same subject to give each the force that is due.[38] The common subject of § 2–101(a) and Rule 10–1–3 is the permissible conduct of the Governor when using public transportation. Section 2–101 *authorizes* the Governor's use of public transportation, while Rule 10–1–3 *restricts* state officials and employees in the use of public funds, property, or time for an election campaign. Although by its enactment the Legislature may give the Governor unlimited security and transportation, it is the Commission that has explicit constitutional responsibility to shape the parameters for ethical demeanor in political campaigns.[39] Given that Rule 10–1–3 and § 2–101 may indeed be susceptible of more than one meaning, *this court's task is to harmonize and reconcile them by placing that construction upon their language which would free both sections from constitutional doubt.*[40] *Unlike that* drawn in the court's pronouncement, my conclusion would accomplish this very end.

¶ 19   Today's opinion declares that legislative failure to include in the text of § 2–101 language that limits the Governor's claim on transportation gives the Commissioner of Public Safety [Commissioner] authority to convey the Chief Executive, at public expense, to political fund raisers and to partisan political campaign meetings. The court's interpretation plainly violates Rule 10–1–3(a)'s explicit restriction against "public fund" financing of campaigns *and serves to inject rather than eliminate serious constitutional doubt. I would find that Rule 10–1–3 is clear and unambiguous.* It forbids the Governor from using state transportation to attend unofficial commitments and activities. Treating the provisions of § 2–101 and Rule 10–1–3 as norms *in pari materia,* I would hold that the latter restrict the former. This conclusion also is compelled by the rule of construction which teaches that specific legislative enactments control over those that are general.[41]

### *The Language of 47 O.S.Supp.1996 § 156.1 does not Allow the Governor's use of State Vehicles to Attend Partisan Political Fund Raisers and Like Unofficial Commitments.*

¶ 20   Both the court and the Chief Executive rely on the provisions in 47 O.S. Supp. 1996 § 156.1 [42] to exempt the Governor from any restrictions on his use of state transportation. Section 156.1 declares it unlawful for state officials or employees (except some se-

**35.** *See* 47 O.S.1991, § 2–101(b), *supra* note 2.

**36.** Even if the language of 47 O.S.1991 § 2–101 does conflict with Rule 10–1–3, this court should construe two conflicting statutes by giving force and effect to each, yet allow both to stand. *See Shimonek v. Tillman,* 150 Okla. 177, 1 P.2d 154, 157 (1931); *Prettyman, supra* note 18; *Sharp, supra* note 18. This standard *also applies* to administrative regulations which conflict with legislative enactments. *See Miller v. United States,* 294 U.S. 435, 439, 55 S.Ct. 440, 442, 79 L.Ed. 977 (1935).

**37.** *See United States v. Freeman,* 44 U.S. 556, 564, 3 How. 556, 11 L.Ed. 724 (1845).

**38.** *See Inexco Oil Co. v. Corporation Commission,* 1981 OK 44, ¶ 10, 628 P.2d 362, 365; *Abbott v.*

*Board of Trustees of Oscar Rose Junior College,* 1978 OK 129, 586 P.2d 1098, 1101.

**39.** *See* Art. 29 § 3(A), Okl. Const.

**40.** *See Turpen, supra* note 34; *Ricks Exploration Company, supra* note 34; *Cowart, supra* note 34.

**41.** *See Duncan v. City of Nichols Hills,* 1996 OK 16, 913 P.2d 1303; *Taylor v. Special Indemnity Fund,* 1990 OK 106, 804 P.2d 431, 432.

**42.** *See supra* note 4.

lect law enforcement personnel and essential employees) to use state transportation for travel to their home or for other personal or private matters.[43]  Because § 156.1 does not list the Governor *eo nomine* as a restricted party, the court views the textual silence as giving the Chief Executive an unfettered claim on public transportation.  *I reject this view as legally unsound.*  The Governor is not to be presumed excluded by a statute *plainly intended to govern all* state officials and employees.  Unlike the British Crown when it was enjoying unrestricted sovereignty status, *the Chief Executive of this State is not constitutionally elevated to a status above the law.*  Moreover, today's construction of the § 156.1 language is a two-edged sword.  If the Governor is not mentioned in that section's text as a party authorized to use State transportation for emergencies, he cannot fulfill his obligation to respond to them [44] unless he uses private transportation.  That conclusion would plainly contravene Oklahoma law.  The Chief Executive is entitled to use public transportation to respond to an emergency even when he attends partisan political functions.  Rule 10–1–3 restricts only the purpose of the Governor's travel, not his destination.  When he is en route to a partisan political function, his purpose is to serve his party and its elected representatives, not the citizens of Oklahoma.

¶ 21  The court's resolution of today's controversy gives the Governor unrestricted use of state transportation, in violation of Art. 10 §§ 14, 17 & 19, Okl. Const., which plainly restrict *to public purposes alone* the benefit which one may derive from expenditures of public funds.[45]  The Governor's travel does not always implicate a public purpose.  If the Chief Executive flies to Japan for a vacation, he does not go there for the benefit of Okla-

homa citizens and hence may not benefit from state-funded transportation.  Section 2–101(b) requires the Commissioner to ensure that the Governor, his immediate family and the Lieutenant Governor all have communications equipment when not on state premises.  With the aid of this equipment the Governor may respond to any emergency that may occur during a partisan political fund raiser or while he is present at any other unofficial activity.  Once an emergency should arise and the Chief Executive begins to respond while in travel *dehors* the range of his public mission, the private-purpose travel becomes public, thus entitling him to state-funded transportation.  Although the Governor's duty is to respond to emergencies within Oklahoma,[46] his travel is not cloaked with a public purpose until he begins to respond to a call of that character.  He may use neither his duty to respond to state emergencies nor his claim on full-time security as a subterfuge for exacting from the State free transportation for unauthorized travel.

### III.

### PARTICIPATION IN PARTISAN POLITICAL FUND RAISING ACTIVITY IS NOT THE GOVERNOR'S OFFICIAL DUTY

¶ 22  Today's pronouncement holds that Rule 10–1–3(h) exempts from scrutiny the ordinary conduct of the Commissioner.[47]  *The court's conclusion is ludicrous.*  The Commissioner is not before this court requesting relief from threatened imposition of penalty for improper use of public funds, property, time and personnel to influence elections.  Although the Commissioner's ordinary conduct includes providing transportation to the Governor, the Commissioner's infractions, if any, are not in controversy here.  *In dispute before us is solely the Governor's conduct.*  The Chief Executive's

---

**43.**  *See* 47 O.S.Supp.1996 § 156.1(A)–(B)(3).

**44.**  *See* 63 O.S.1991 § 683.8(a) which provides:
The Governor shall have general direction and control of the Civil Defense Agency and shall be responsible for carrying out the provisions of this act and, in the event of disaster beyond local control, may assume direct operational control over all or any part of the civil defense or emergency functions in this state.

**45.**  *See supra* note 3.

**46.**  *See* 63 O.S.1991 § 683.8(a), *supra* note 42.

**47.**  74 O.S.Supp.1996, Ch. 62, App., § 257:10–1–3(h).

ordinary duties do not include travel to partisan political fund raisers.[48] Subsection (h) of Rule 10–1–3 exempts from subsection (a)'s restriction *only those activities* in which the Governor engages during the discharge of official duties which may incidentally also give support to the Governor's own (or of another state official's) political campaign. These exempt activities may include a State of the State Address at which the positive aspects of the Governor's administration may be stressed, or an address at the unveiling of a stamp honoring Jim Thorpe.

¶ 23 Another vice in today's decision is its gratuitous reference to Art. 6 § 8, Okl. Const. That section states that the Governor shall (1) cause all laws to be faithfully executed, (2) conduct all business for Oklahoma in person or in a manner prescribed by law, and (3) *"be the conservator of peace throughout the State."* [49] The court appears to invoke Art. 6 § 8, Okl. Const., to support its conclusion that the Chief Executive does not violate the Constitution when he uses state transportation to attend a political event. What the court's § 8 reference aims to anoint with its *imprimatur* is a mystery wrapped in an enigma. One could easily comprehend the court's comment as its declaration that the Governor *must* attend partisan political events *to maintain peace throughout Oklahoma.* Although this notion is indeed interesting and even ingenuous, I find it devoid of legal acumen. *The text of Art. 6 § 8, Okl. Const., adds absolutely nothing to today's discourse but sheer obfuscation.*

munications equipment and security. The cited section authorizes the Commissioner to provide the Chief Executive with necessary communications equipment even when he is not in a state vehicle or on state property.[50] The Commission does not usurp the power of the Legislature when it restricts the Governor's statutory claim on publicly subsidized travel. The Chief Executive is *both free and required* to decline the use of state-funded transportation when attending such unofficial duties as partisan political events. Public officials must refrain from exploiting their office for private gain.[51]

¶ 25 The Governor's statutory claim on twenty-four-hour-a-day security is neither inextricably tied to the Commissioner's duty to provide a publicly-owned vehicle *nor in contest here.* I would uphold the former as a legitimate perquisite conferring clear benefits on the State, but would narrowly construe the latter. When attending events or meetings that are not included in his official duties [52]—such as partisan political functions and fund raisers—*the Chief Executive should either arrange for private transportation, to which the Commissioner must attach all necessary communications equipment and personal security, or reimburse the state for excessive use of its property.* The Chief Executive's security personnel can travel in his personal car or in a marked patrol unit without incurring greater expense than that which would follow if the Governor were transported on official duties.

## IV.

### THE GOVERNOR'S STATUTORY CLAIM ON RECEIVING TWENTY-FOUR–HOUR–A–DAY SECURITY IS NOT WEDDED TO THE COMMISSIONER'S DUTY TO PROVIDE STATE–FUNDED TRANSPORTATION

¶ 24 By the provisions of § 2–101 the Governor is entitled to transportation, com-

## V.

### THE COMMISSION MUST DETERMINE WHETHER THE GOVERNOR HAD ADEQUATE ADVANCE NOTICE OF THE CONCRETIZING RULE 10–1–3 NORMS' EFFICACY TO AVOID BREACHING ITS RESTRICTIONS

¶ 26 Rule 10–1–3 is *penal* in nature. Offenders against its proscriptions are subject

---

**48.** *See* Art. 6 §§ 1–14, Okl. Const.; 74 O.S. §§ 1 et seq.

**49.** *See* Art. 6 § 8, Okl. Const. (emphasis added).

**50.** *See* 47 O.S.1991 § 2–101(b), *supra* note 2.

**51.** 51 O.S.1991 § 302(1).

**52.** *Id.*

to civil penalties that include a fine, possible censure, suspension, or removal from office.[53] The parties stipulated that if he is found to have breached Rule 10–1–3, the Governor will pay a $10,000 penalty for his unauthorized travel. Penal regulations are subject to a judicial review which will ensure that they clearly and without doubt apply to the facts constituting the alleged breach.[54]

¶ 27 Whether the Governor is subject to the Rule 10–1–3 commands when he travels to a partisan political function and on unofficial duties *is a question of first impression. One may not be penalized for utilizing a resource that appeared to be legally available.*[55] A fair warning—in common, understandable language—that intelligibly communicates the parameters of conduct to be proscribed is a *sine qua non* of due process incident to imposition of penalty, civil or criminal.[56] If one engages in conduct charged as included within the interdiction of an overbroad statute, lack of proper notice of what was actually and intelligibly prohibited would avail as a constitution-based defense.[57] If a statute or rule is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,"[58] due process is offended by that law's use for imposition of punishment. No one may be forced to spec-

ulate as to the meaning and application of a penal regulation.[59]

¶ 28 Art. 29 § 5, Okl. Const., grants the Commission the authority to interpret its rules and regulations. Because this court must not (1) *usurp* the Commission's constitutional power initially to interpret its own rules and (2) *apply to a penal regulation* a construction *neither intelligibly communicated by the pertinent text of the law nor firmly settled by precedent,*[60] I would direct that, after this cause's termination, the Commission conduct an inquiry into whether the Governor had adequate advance notice of the efficacious character of Rule 10–1–3, to be analyzed against the backdrop of the Commission's constitutional stature and the then-extant constitutional and legislative provisions *in pari materia.* Advance notice should fully advise a reasonable person of the restricted conduct's outer perimeter. The uniquely appropriate objective-standard test I propose for the Commission's use in this probe would call for an assessment of the pervasive legal culture which dominated the key affected agencies during the critical period in question.[61] The appraisal should aid in determining if the *centrality* of the law's controlling norms that govern the conduct in controversy—the Commission rules together with their explicit constitutional underpin-

**53.** *See* 74 O.S.Supp.1996, Ch. 62, App., § 257:1–1–11.

**54.** *See So–Lo Oil Co., Inc. v. Total Petroleum, Inc.,* 1992 OK 71, ¶ 8, 832 P.2d 14, 18 n. 24; *Samson Resources Co. v. Cloud,* 1991 OK CIV APP 55, ¶ 8, 812 P.2d 1378, 1381 (penal regulations are subject to that review which will ensure that their application is clear and without doubt.); *Quinn v. City of Tulsa,* 1989 OK 112, ¶ 44, 777 P.2d 1331, 1339 (decision to apply penal law to activity must be clear and without doubt.).

**55.** *Raley v. Ohio,* 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959). *See also, Cox v. Louisiana,* 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965) (declaring "indefensible" the State's imposition of penalty upon one who exercised a state-sanctioned privilege).

**56.** *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931).

**57.** *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

**58.** *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). *See also generally,* authority cited *infra* note 60.

**59.** *United States v. Cardiff,* 344 U.S. 174, 176, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952); *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

**60.** *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (citing *Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977)).

**61.** The offices of the Governor, the Attorney General, the Commissioner of Public Safety, and the Commission.

nings—was indeed appreciably dimmed, if not verily eclipsed, by the mistaken notion that the legality of the Governor's actions under review here was to be assayed solely by the parameters of § 2–101 (the nearly open-ended legislative license).

¶ 29 An affirmative answer to this question would militate against finding the advance notice adequate.[62] No one can be held to know about the fine-levying provisions of a regulatory law that lies obscured from the actor's sight by a maze of seemingly eclipsing norms.[63] Fair doubt as to the existence of legal prohibition is resolved in favor of the person against whom enforcement is sought.[64] If the Commission should find that the Governor did not have adequate advance notice that his use of publicly-funded travel to attend partisan political fund raisers was interdicted, the doubt should be resolved in his favor.

¶ 30 On the other hand, breach of an unambiguously worded and reasonably discoverable regulation would subject the offender to the textually prescribed sanctions. If the Commission were to find that extant law did intelligibly advise the Governor—that the use of public transportation for private purposes was prohibited—in time to avoid the law's breach, I would require him to pay the agreed-upon penalty.

## VI.

## SUMMARY

¶ 31 I can neither concur in today's pronouncement nor join the court *in caponizing* the Oklahoma Ethics Commission—a constitutional agency of Oklahoma's government.

¶ 32 As an elected official, the Chief Executive *must abide by the Commission rules that govern other elected officials and their campaigns.* Rule 10–1–3 (of the Commission) prohibits elected state officials (and hence the Governor) from using public funds, property, or time to influence elections. The Commission requests that this court endorse a sanction against the Governor for using state-funded transportation to attend partisan political fund raisers. Under today's pronouncement, the Governor is free to use state property for unofficial duties (such as attending partisan political fund raisers, enjoying an afternoon swim at the lake, or playing a round of golf at the Oklahoma City Golf and Country Club).

¶ 33 Contrary to today's pronouncement, I would: (a) *declare* that Rule 10–1–3 concre-

---

**62.** *Thomas v. United States,* 696 F.Supp. 702, 706 (D.C.D.C.1988) (holding that criminal statutes *and administrative regulations which carry penal sanctions* are unconstitutional if ordinary people cannot understand the conduct that is sanctioned. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.") (quoting *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)). *See also, United States v. Cook,* 445 F.2d 883, 890 (8th Cir.1971) (requiring that, before prosecuting violations, the selective service system must adopt well-defined administrative rules and regulations that give adequate notice to registrants of penal sanctions for proscribed conduct).

**63.** Penal regulations which are couched in language insufficient to provide the offender adequate advance notice of the conduct to which his actions are required to be conformed violate the standards of due process, making prosecution constitutionally invalid. *See United States Civil Service Comm'n v. National Ass'n of Letter Carriers AFL–CIO,* 413 U.S. 548, 577, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (applying to a properly promulgated administrative regulation's pro-

scription of federal employee participation in partisan political fund raisers the standard, pronounced in *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954), that a criminal statute's definiteness be determined by whether the statutes's language gives a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (holding that vagrancy ordinance was void for vagueness because it failed to give persons of ordinary intelligence notice of the forbidden conduct) (citing *Harriss, supra*). *See also Cole v. Arkansas,* 333 U.S. 196, 201–02, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948) (declaring that due process requires notice of the specific charge and of the right to be heard during a criminal proceeding).

**64.** *See generally Quinn, supra* note 54; *Samson, supra* note 54, at page 1378; *State v. District Court of Cleveland County,* 1991 OK CR 68, ¶ 6, 816 P.2d 552 (all holding that penal statutes should be liberally interpreted in favor of the accused.).

tizes the language used in § 2–101 and fills the interstices that lie between the provisions of that section and the personal-use restriction of state transportation prescribed by § 156.1, as well as between the requirements for publicly beneficial use of public funds which are explicitly mandated by Art. 10 §§ 14, 15, 17 & 19, Okl. Const; (b) with the aid of Rule 10–1–3, I would *construe* § 2–101, § 156.1 and Art. 10 §§ 14, 15, 17 & 19, Okl. Const., as a single harmonious whole, and would restrict the Governor's authorized use of state transportation to his official duties and state emergencies, *excluding* partisan political fund raisers and purely private travel; (c) *hold* that to permit the Governor to use state funds for transportation to partisan political events offends every Oklahoma taxpayer's constitutional right to freedom of speech, conferred by the First Amendment to the United States Constitution; (d) *pronounce* that all jurisprudence in contravention of the Commission's fundamental-law authority as well as of its primary responsibility to concretize any open-ended legislative norms of ethics contravenes the State's Constitution; (e) *view* the language of Rule 10–1–3 and § 2–101 as *in pari materia* and construe their text together with Art. 10 §§ 14, 15, 17, and 19, Okl. Const., to restrict the Chief Executive's use of state-funded transportation to official duties only, requiring him to provide his own transportation or reimburse the State when traveling in a state vehicle on unofficial and personal business; and (f) *direct* that before any penalty may be assessed for the Governor's breach, the Commission must, on termination of this cause, hold an inquiry to determine whether Rule 10–1–3's restriction against the use of state transportation to attend partisan political fund raisers, viewed together with the seemingly disharmonious statutory material, gave the Governor adequate advance notice of the prohibited conduct to be eschewed.

¶ 34  If the Commission should find that its pertinent rules (and their fundamental-law underpinnings) appeared so eclipsed by the seemingly discordant legislative norms as to be easily misperceived as having been supplanted, the Governor should be exonerated of any breach. If the Commission were to find that the extant law's scattered norms timely and intelligibly advised the Governor that his indiscriminate use of public transportation was a proscribed activity, the Chief Executive should be required to pay the agreed-upon penalty. My pronouncement would serve as notice that Rule 10–1–3 does prohibit the Governor's use of state vehicles for transportation to partisan political events. I would apply the declared law to this case, to all like controversies now pending before judicial or administrative tribunals, to all cases presently in the appellate litigation process, and *prospectively* to all disputes over similar or like issues to arise *after* the court's pronouncement will have become final.